87 P.3d 275

**STATE Of Hawai'i, Plaintiff-Appellee**

v.

**William Lowell McCRORY,
Defendant-Appellant.**

No. 25351.

Supreme Court of Hawai'i.

April 7, 2004.

Daniel G. Hempey, Kapaa, On the briefs, for defendant-appellant.

Craig A. DeCosta, Deputy Prosecuting Attorney, County of Kauai, On the briefs, for plaintiff-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

We hold (1) that evidence that an accused did not proclaim his innocence to a fellow inmate, while jailed pending trial, is irrelevant and prejudicial in a criminal trial and (2) that under the circumstances of this case, evidence that an accused also stated he hoped the charges would be reduced to a lesser charge (in this case from murder to manslaughter) was similarly tainted. Whereas such tainted evidence was admitted herein, we vacate the September 19, 2002 judgment and conviction of the fifth circuit court (the court)[1] and remand this case for a new trial. In light of our disposition, we need not decide the other points raised by Defendant–Appellant William Lowell McCrory (Defendant).

### I.

On July 12, 2002, following trial, the jury returned a verdict of guilty as to murder in the second degree, Hawai'i Revised Statutes (HRS) §§ 707–701.5 (1993) and 706–656 (Supp.1996) against Defendant on the charge that he intentionally or knowingly caused the death of Brent Kerr (Kerr). A judgment of conviction and sentence was filed on September 19, 2002. Notice of appeal was filed on September 24, 2002.

On appeal Defendant maintains, *inter alia*, that the court erred when it (1) allowed testimony that Defendant never proclaimed his innocence to his pretrial cellmate, (2) refused to allow Defendant to rebut testimony of the cellmate that Defendant did not proclaim his innocence, and (3) permitted the cellmate to testify that Defendant hoped the charges would be reduced to manslaughter.[2]

---

1. The Honorable Clifford L. Nakea presided.

2. The other issues raised by Defendant are that the court erred when it: (1) precluded Defendant's physical therapist from testifying because of defense counsel's alleged untimely disclosure of the witness, (2) failed to give an instruction as to "involuntary" or "non-self induced intoxication," and (3) denied an instruction on manslaughter. Defendant also maintains that Defendant was denied effective assistance of counsel when his attorney called a Robert Sherman (Sherman) as a witness. *See infra* note 10.

## II.

During the trial in the case in chief of Plaintiff–Appellee State of Hawai'i (the prosecution), Billy Pierce (Pierce) testified that he had awakened from a drunken blackout and saw Defendant pull Kerr from his van, head-butt Kerr, and heard Defendant stab Kerr. Kerr died as a result of the stab wounds.

Rory Knezevich (Knezevich) was also called as a prosecution witness. Knezevich was the cellmate of Defendant for a few days. The prosecution had disclosed prior to trial that it intended to call Knezevich as a witness in its case in chief. Defense counsel objected on the ground that Knezevich would not testify to anything Defendant said that was incriminating:

> [DEFENSE COUNSEL] [W]hat I understand ..., the [prosecution] is calling him to—ostensibly, I guess, to say that [Defendant] made incriminating statements while he was in the—shared the same cell for a few days back in October.

> My reading of the—what he told the police, though, is that it's not—it's not anything incriminating, ... [b]ut.. I think, that ... the [prosecution] wants the—will want the jury to interpret his words as incriminating.

In response, the court said, "What we can do is start, we can start with [Knezevich]." Knezevich testified *inter alia*, that 1) Defendant had never proclaimed his innocence while incarcerated prior to trial, and 2) Defendant said he hoped he could get the charges reduced to manslaughter.

During direct examination of Knezevich, the prosecution pursued the following line of questioning:

> Q. Now, during the time that you were in the cell with the Defendant, the three days that you were in there, did he ever tell you that somebody else had done the stabbing?

> A. No.

> Q. *Did he ever tell you: I'm innocent, they've got the wrong guy?*

> A. *No.*

(Emphases added.)

Defense counsel conducted the following cross-examination:

> Q. [M]r. McCrory never said to you: I killed this guy. Did he?

> A. He never said he didn't.

> Q. Answer my question. Did he ever say: I killed this guy. Yes or no?

> A. Taking out of con—

> Q. Did he ever say: I killed this guy. Yes or no?

> A. No.

The prosecution also elicited testimony from Knezevich that Defendant said he hoped to have the charges reduced to manslaughter:

> Q. Now, can you tell us whether or not at some point there was a discussion regarding his chances or possible pleas?

> [DEFENSE COUNSEL] I am going to object to that, Your Honor. Can we approach?

> ....

> A. About manslaughter, [Defendant] had mentioned on several occasions that he was in hopes to—

> [DEFENSE COUNSEL] Objection.

> THE COURT: Noted for the record

> Q. I'll repeat the question for you. Was there a point in the discussion where there was conversation regarding manslaughter and possibilities of getting—well, let's just start with that one for now.

> ....

> Q. Go ahead, you can answer.

> Q. He was in hopes that he could get the charges reduced to manslaughter.

After Knezevich's testimony, defense counsel made a request to call four other inmates for rebuttal.

> [DEFENSE COUNSEL] In response to [Knezevich] being allowed to testify ... we would like to request of the [c]ourt that we be allowed to call witnesses to whom [Defendant] has—has said or repeated that his—his conviction that he is innocent in

the case, and these would be other inmates.

The court denied the request.

During the cross-examination of Defendant, Defendant denied making any statement about manslaughter.

Q. Was there also a discussion about possibly getting manslaughter?

A No.

### III.

Defendant argues that the court erred in allowing his cellmate, Knezevich, to testify that Defendant never proclaimed his innocence. As discussed, the prosecution asked Knezevich whether Defendant ever "told [Knezevich] that somebody else had done the stabbing[,]" and whether Defendant ever said that he was "innocent" or that "they've got the wrong guy." *See supra* at 205, 87 P.3d at 277. In response to each of these questions, Knezevich simply replied, "No." The prosecution did not provide any foundational testimony that suggested Knezevich had *asked* Defendant if he was "innocent[,]" or if Knezevich had asked whether "somebody else had done the stabbing[.]" [3] Similarly, the prosecution did not indicate that the context of any conversation was such that replies of this nature were to be expected from Defendant. Instead, the prosecution's questions focused on the absence of any such statement as an indication of Defendant's guilt.

### A.

"This court reviews questions of relevancy, within the meaning of Hawai'i Rules of Evidence (HRE) Rules 401 (1993) and 402 [ (1993) ] under the right/wrong standard, inasmuch as the application of those rules can yield only one correct result." *State v. White*, 92 Hawai'i 192, 204, 990 P.2d 90, 102 (1999) (footnotes, citation, and internal quotation marks omitted). HRE Rule 401 states that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the deter-

mination of the action more probable or less probable than it would be without the evidence." In *State v. Smith*, this court explained that "[e]vidence is relevant if it tends to prove a fact in controversy or renders a matter in issue more or less probable." 59 Haw. 565, 567, 583 P.2d 347, 349 (1978), *partially overruled on other grounds by State v. Kelekolio*, 74 Haw. 479, 503, 518–19, 849 P.2d 58, 69, 76 (1993). HRE Rule 402 instructs that "[e]vidence which is not relevant is not admissible."

■ On appeal, Defendant does not precisely raise the question of whether such testimony was irrelevant under HRE Rules 401 and 402 but contends that the testimony should have been excluded under HRE Rule 403 (1993). However, "Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) states, 'Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.' An appellate court may recognize plain error when the error committed affects substantial rights of the defendant." *State v. Grindling*, 96 Hawai'i 402, 404 n. 4, 31 P.3d 915, 917 n. 4 (2001) (quoting *State v. Cullen*, 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997)). In applying the test for relevancy, it is manifest that the absence of statements by Defendant proclaiming his innocence to Knezevich was of no consequence in proving or disproving Defendant's guilt.

The fact that Defendant did not expressly state to Knezevich that he was innocent or that the prosecution had the wrong defendant, does not make it "more or less probable" that Defendant committed the murder as charged. HRE Rule 401. Rather, the absence of such a statement had no bearing on any "fact of consequence," such as whether Defendant stabbed Kerr, whether he knew Kerr, or whether he had the requisite intent for the offense of murder. As in the present case, there are "situations in which an accused is clearly under no duty to speak" and where there are various reasons, "regardless of guilt or innocence[,]" for maintaining one's

---

**3.** As previously noted, defense counsel objected to this line of testimony, suggesting that it was not incriminating, but that the prosecution would

"want the jury to interpret his words as incriminating." *See supra* at 205, 87 P.3d at 277.

silence. *Fowle v. United States,* 410 F.2d 48, 50 (9th Cir.1969).[4] "In such circumstances, since innocent and guilty alike may choose to stand mute, . . . proof of such former silence should be excluded under universally recognized principles of evidence." *Id.* Defendant's silence in the present case, or more precisely, the absence of an express declaration of innocence, is similarly "ambiguous, and thus of dubious probative value[,]" for many other "explanations for the silence" exist that are not indicative of guilt. *Doyle v. Ohio,* 426 U.S. 610, 619 n. 8, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Thus, Defendant's failure to proclaim his innocence to Knezevich is irrelevant under HRE Rule 401 and, thus, not admissible by virtue of HRE Rule 402. Nonetheless, the prosecution used this line of questioning to suggest to the jury that the absence of exculpatory statements by Defendant was proof of Defendant's guilt. Although such testimony was not indicative of guilt or innocence, the court, by admitting it, allowed the jurors to base a finding of guilt on that evidence. As such, the court was "wrong" in permitting Knezevich to relate these matters. *White,* 92 Hawai'i at 204, 990 P.2d at 102.

### B.

■ Assuming, *arguendo,* that the absence of such comments was somehow relevant, Knezevich's testimony would be inadmissible under HRE Rule 403 as a matter of law. HRE Rule 403 provides that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Citing HRE Rule 403, Defendant asserts that relevant evidence should be excluded "if its probative value is outweighed by the danger of unfair prejudice." Defendant argues that "it was extremely prejudi-

cial for the court to allow [Knezevich] to testify that [Defendant] did not proclaim his innocence to him, to a cellmate that [he] had just met."

In applying the abuse of discretion standard of review to the admissibility of relevant evidence under HRE Rule 403, this court has acknowledged that " 'the determination of the admissibility of relevant evidence under HRE 403 is eminently suited to the trial court's exercise of its discretion because it requires a cost-benefit calculus and a delicate balance between probative value and prejudicial effect.' " *Sato v. Tawata,* 79 Hawai'i 14, 19, 897 P.2d 941, 946 (1995) (quoting *Kealoha v. County of Hawai'i,* 74 Haw. 308, 315, 844 P.2d 670, 674 (1993)) (internal quotation marks and brackets omitted). Because such a decision requires a judgment call on the part of the trial court, "its discretion is reviewed under the traditional abuse of discretion standard and may not be reversed on appeal unless the trial court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Id.*

Knezevich's testimony that Defendant failed to expressly proclaim that he was innocent or that someone else committed the crime, was plainly prejudicial. The jurors in the present case, after hearing, and later being instructed to consider, all of the evidence, could have erroneously assumed that Defendant was required to or would have professed his innocence to his cellmate if he was not guilty. Such testimony was prejudicial and would mislead the jury, because it incorrectly suggested that Defendant had the burden of proving his innocence. This court has explained that the "presumption of innocence in favor of the accused[ ] . . . 'is a basic component of a fair trial under our system of criminal justice[.]' " *State v. Iosefa,* 77 Hawai'i 177, 182, 880 P.2d 1224, 1229 (1994) (quoting *Estelle v. Williams,* 425 U.S. 501,

---

4. The Ninth Circuit posited that "one situation in which silence has been deemed more meaningful and thought to be so significant as to have probative weight is the case wherein it persists in the face of accusation. It has been assumed that an accused, in such circumstance would, more likely than not, dispute untrue accusations." *Fowle,* 410 F.2d at 50. In *Fowle,* however, the Ninth Circuit did not consider excluding evidence regarding the defendant's silence on Rule 403 grounds. *Id.* at 52. Instead, that court excluded such evidence because the "prosecution's use of [the defendant's] silence violated the Fifth Amendment" and because it "was reversible error" to permit evidence of silence to be used "for the purpose of impeachment." *Id.*

503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976)). The enforcement of this principle " 'lies at the foundation of the administration of our criminal law.' " *Id.* (quoting *Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1985)). "In a criminal trial, the state has the burden of proving the defendant's guilt beyond a reasonable doubt." *State v. Matsuda*, 50 Haw. 128, 129, 432 P.2d 888, 890 (1967).

This burden on the prosecution "remains constant from the beginning to the end of the trial, never shifting to the defendant who is shielded throughout by the presumption of innocence until prove[n] guilty from all the evidence beyond a reasonable doubt." *Territory v. Adiarte*, 37 Haw. 463, 469 (1947), *superceded by statute on other grounds as stated in State v. Uyesugi*, 100 Hawai'i 442, 456 n. 17, 60 P.3d 843, 857 n. 17 (2002); *cf. State v. Alo*, 57 Haw. 418, 424, 558 P.2d 1012, 1016 (1976) (noting that "there is nothing more basic and fundamental than that the accused has a constitutional right to remain silent [under the Fifth Amendment], and the exercise of this privilege may not be used against him"); *Doyle*, 426 U.S. at 619, 96 S.Ct. 2240, n. 8 (explaining "that silence at the time of arrest may be inherently ambiguous even apart from the effect of Miranda warnings, for in a given case there may be several explanations for the silence that are consistent with the existence of an exculpatory explanation").

■ Thus such testimony is inadmissible, for its "probative value is substantially outweighed by the danger of unfair prejudice ... or [of] misleading the jury" by shifting the burden of proof to Defendant. HRE Rule 403. Defendant has no affirmative duty to proclaim his innocence, much less to do so to his cellmate. *Cf. State v. Furutani*, 76 Hawai'i 172, 186, 873 P.2d 51, 65 (1994) (explaining that comments by jurors regarding a defendant's "failure to testify or otherwise present evidence of his innocence constitute[s] substantial evidence of juror misconduct"). Accordingly, the lack of such statements cannot be used as evidence of Defendant's guilt, and must be excluded under HRE Rule 403. The court abused its discretion by "disregard[ing] rules or princi-

ples of law or practice to the substantial detriment of" Defendant. *Sato*, 79 Hawai'i at 19, 897 P.2d at 946.

## IV.

■ Defendant contends that the error was exacerbated by the fact that he was not allowed to call witnesses in rebuttal to whom he did proclaim his innocence. The court did state that the evidence received was that Defendant said nothing about innocence and said nothing about guilt and, thus, the testimony of other cellmates was inadmissible. But as Defendant argues, "if the testimony by the defense witnesses regarding Defendant's statements of innocence would have been inadmissible, then testimony by the prosecution witness to the same [e]ffect was also inadmissible." Defendant's claims of innocence to his other cellmates have no relationship to guilt or innocence. *Adiarte*, 37 Haw. at 469. Thus, his proclamations of innocence do not have "any tendency to make the existence of any fact ... of consequence to the determination of the action more or less probable." HRE Rule 401. Accordingly, any testimony regarding Defendant's statements of innocence was irrelevant and excludable under HRE Rule 402.

## V.

Defendant also asserts that the court erred in allowing Knezevich to testify that Defendant desired a reduction of the charge to manslaughter. After asking Knezevich whether Defendant discussed his "chances or possible pleas[,]" Defendant objected. The prosecution rephrased the question and asked if "there [was] a point in the discussion where there was conversation regarding manslaughter." In response, as mentioned previously, Knezevich testified that "[Defendant] was in the hopes he could get the charges reduced to manslaughter."

Defendant maintains that the testimony was (1) excludable under HRE Rule 408 (1993), (2) irrelevant inasmuch as "it may have little relationship to guilt or innocence," and (3) highly prejudicial because "the jury was never told the definition of

manslaughter." [5]   Defendant points out that "the prosecutor ... us[ed] this testimony as an example of Defendant's 'statements of consciousness of guilt' during closing arguments."   The prosecution essentially argues that the matters were not plea negotiations and therefore admissible.

## A.

■   Defendant's argument that this testimony should be excluded under HRE Rule 408 [6] is not persuasive.   In *State v. Gano,* this court held that "HRE Rule 408 [applies] in criminal proceedings" in that " 'related compromises or attempts to compromise civil liability are not admissible in a criminal trial because of the danger that such evidence may be taken as criminal guilt.' "   92 Hawai'i 161, 168, 988 P.2d 1153, 1160 (1999) (quoting *In the Interest of Doe,* 79 Hawai'i 265, 276, 900 P.2d 1332, 1343 (1995)).

HRE Rule 408 does not apply to Defendant's statements.   To come within the protection of HRE Rule 408, statements must be "made in the course of compromise[,]" and in the present case "[e]vidence to establish the claim that the statements were made in the course of such negotiations has yet to be put in the record [by Defendant]."   *Myers v. Cohen,* 67 Haw. 389, 396, 688 P.2d 1145, 1151 (1984).   Instead, Defendant's statements were made to Knezevich, his cellmate, who was not a party to the proceedings.   Since Defendant's statements, made to Knezevich, were not made in the context of "offering," "accepting," or "attempting to" settle or mediate, HRE Rule 408 would not otherwise require their exclusion.[7]   HRE Rule 408; *cf.*

*Myers,* 67 Haw. at 396, 688 P.2d at 1151 (explaining that "[n]ot every conversation between opposing counsel [and appellant] constitutes compromise negotiation"); *see Trans Union Credit Info. Co. v. Associated Credit Serv., Inc.,* 805 F.2d 188, 192 (6th Cir.1986) (explaining that Federal Rule of Evidence (FRE) Rule 408 [8] excludes only evidence of conduct and statements made solely as part of the settlement negotiations, and not statements and conduct made at the meeting which are unrelated to such compromise negotiations (citations omitted)).

## B.

■   Although not excludable under HRE Rule 408, this testimony is irrelevant under HRE Rule 401 under the circumstances of this case.   Contrary to the prosecution's contention, this statement does not establish that "Defendant's focus was getting convicted of a reduced offense rather than an acquittal indicating a consciousness of guilt."   On the contrary, Defendant's reference to a reduction of the charges against him does not "make the existence of any fact" regarding whether he committed murder "more or less probable than it would be without" this testimony.   HRE Rule 401.

■   Defendant may have wanted to "get the charges reduced" for any number of reasons other than a "consciousness of guilt."   Again, a defendant may believe the evidence against him is so strong and the risk of conviction great so as to desire a reduction of a charged offense to a lesser one.   It is possible that an accused, whether in fact

---

5.   The court refused to give a manslaughter instruction apparently requested by Defendant.

6.   HRE 408 provides, in relevant part, that
   [e]vidence of (1) furnishing or offering or promising to furnish, or (2) accepting or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, or (3) mediation or attempts to mediate a claim which was disputed, *is not admissible to prove liability* for or invalidity of the claim or its amount. . . .
   (Emphasis added.)

7.   In *Gano,* this court further clarified that HRE Rule 410 establishes the policy of protecting plea bargain discussions, and forbids the admission of

evidence against the defendant "who made the plea or was a participant in the plea discussions."   92 Hawai'i at 169 n. 5, 988 P.2d at 1161 n. 5. In the present case, Defendant does not claim the statements should have been protected under HRE Rule 410 or that the statements were made in the context of plea negotiations with the prosecution.

8.   "HRE Rule 408 is substantially similar FRE 408 and, therefore, interpretations of the federal rule may be used as an aid in construing [HRE Rule 408]."   *In the Interest of Doe,* 79 Hawai'i at 276, 900 P.2d at 1343.

innocent or guilty, may prefer charges be "reduced" to mitigate the severity of punishment in the event of a conviction. There is no evidence of the context of Defendant's alleged "hope," and whether such "hope" pertained to a verdict at trial, or a contemplated plea. If Defendant was considering a plea, it is recognized that a defendant may choose to plead even if he or she believes he or she is innocent but the risk of conviction appears great. *See Edwards v. Carpenter*, 529 U.S. 446, 448, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000) (involving a defendant who "entered a guilty plea while maintaining his innocence" to murder and robbery charges); *North Carolina v. Alford*, 400 U.S. 25, 38, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (explaining that a defendant may enter a guilty plea "despite his professed belief in his innocence"); *State v. Gomes*, 79 Hawai'i 32, 38, 897 P.2d 959, 965 (1995) (stating that in "exchange for his plea, the prosecution dropped one of the charges against [the defendant]"). This court has explained that " 'a guilty plea or no contest plea is very typically entered for the simple 'tactical' reason that the jury is unlikely to credit the defendant's story.' " *Gomes*, 79 Hawai'i at 38, 897 P.2d at 965 (quoting *United States v. Barker*, 514 F.2d 208, 221 (D.C.Cir.1975)). Thus " 'a court may accept such a 'tactical' plea even from a defendant who continues to assert his innocence.' " *Id.* (quoting *Barker*, 514 F.2d at 221). As such, this statement was not an "admission of guilt" as claimed by the prosecution.

■ Assuming *arguendo* this statement is relevant, it must be excluded under HRE Rule 403. For the reasons stated above, a "hope" that the charges would be reduced to manslaughter cannot be assigned anything but minimal probative value. This statement is substantially outweighed by the "danger of unfair prejudice" to Defendant, for the jury may incorrectly believe Defendant's statement could only imply his guilt. HRE Rule 403. Because such evidence was admitted, the jury would be left with the mistaken view that if he hoped for a reduction in charges, Defendant had committed the murder. *Cf. In the Interest of Doe*, 79 Hawai'i at 275–76, 900 P.2d at 1342–43 (explaining that the reason for excluding settlement negotiations "is their irrelevancy" and the risk of leaving "the

jury under the impression that the settlement by the defendant . . . was evidence of his criminal guilt").

The prosecution relied on this testimony, during its closing arguments, as "indicating [Defendant is] guilty of the offense." As the "probative value" of a hope of having the charges reduced is "substantially outweighed by the danger of unfair prejudice . . . or [of] misleading the jury," it should have been excluded under HRE 403. Thus by admitting such testimony, the court abused its discretion to the "substantial detriment" of Defendant. *Sato*, 79 Hawai'i at 19, 897 P.2d at 946.

## VI.

■ In evaluating whether an erroneous admission of evidence is harmless, this court has explained that

[e]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in light of the entire proceedings and given the effect to which the whole record shows it is entitled. In that context, the real question becomes whether there is a *reasonable possibility that error might have contributed to conviction.* If there is such a reasonable possibility in a *criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.*

*Gano*, 92 Hawai'i at 176, 988 P.2d at 1168 (citation, brackets, and internal quotation marks omitted) (emphases added). It is uncontested that both Pierce and Defendant were in Defendant's vehicle the night of the murder, and that Kerr's blood was found in the vehicle.

As discussed, Pierce testified that as he awakened from his drunken blackout, he saw Defendant "head-but[t Kerr]," and then heard Defendant stab him. Pierce testified that afterwards Defendant handed him the knife and that it was "dripping with blood." Pierce admitted that he "drove the vehicle" and helped dump Kerr's body in some bushes. In addition, Pierce testified that he owned the murder weapon, which he hid in a suitcase after the night of the incident. He

conceded that he had "lied" to the police when he gave his first statement denying any involvement in the crime, and that on the night in question he was "very drunk," "depressed[,]" and "on a binge." Pierce acknowledged that he made the second statement implicating Defendant as causing the death of Kerr to police because Pierce was afraid of going to jail.

Knezevich testified that Defendant told him that Defendant was charged with murder. In response to a question about the evidence against him, Knezevich related that Defendant said "there was a lot of blood on the inside of his car, and . . . he had been driving the automobile with the blood inside the car." Knezevich related that "at one point [Defendant] showed [Knezevich] a cut on his hand, and [Knezevich] asked him how he got the cut and [Defendant] said he cut himself with a knife . . . and that he had been in a fight."

On cross examination, Knezevich recalled that Defendant had mentioned that there was someone else involved, and that Defendant never said that he killed Kerr. Knezevich conceded that he could not remember if Defendant showed him a cut on his "thumb or another finger."

The prosecution called Christine Taniguchi (Taniguchi), whose husband knew Defendant from work, and often socialized with Defendant "after work or on weekends." Taniguchi testified that on the night in question Defendant dropped by her house and that he "looked pretty drunk." She further testified that Defendant "asked to borrow a knife[,]" and "alternated between" saying that he wanted to "kill" or "f* *k [somebody] up." Taniguchi explained that she said "no" to Defendant's request for a knife.

On cross examination, Taniguchi admitted that Pierce came to see her, told her that Kerr had been killed, and told her that "she better go talk to the police." She also conceded that she did not like her husband drinking with Defendant, and whenever her husband socialized with Defendant, it always involved alcohol. Taniguchi admitted that she was separated from her husband because of his drinking.

Detective Sam Sheldon (Sheldon) testified that the hair found on Kerr's body did not match Defendant's hair, and the police found no fingerprints on the murder weapon. Sheldon noted that during Pierce's "initial interview [Pierce] was shaking" and "very nervous" and had "pretty much a frantic type of a reaction." Detective Marvin Rivera testified that Pierce was initially arrested for the murder along with Defendant.

Defendant denied "hav[ing] anything to do with" Kerr's death. In response to Knezevich's testimony, Defendant reaffirmed that he "didn't say [he] did it" to Knezevich. As to Knezevich's testimony that Defendant said that he had been driving around with blood in his car, Defendant countered by explaining that he "didn't even believe there was blood in his car at that point." He described his thoughts in reaction to hearing Knezevich's testimony as, "[r]ight, I'm going to drive around with blood in my truck." When questioned if he had a conversation with Knezevich about a knife, Defendant replied, "Perhaps."

As to Taniguchi's testimony, Defendant denied ever asking her for a knife, but instead said he just asked if Taniguchi's husband was home, and then left. Defendant testified that after he left Taniguchi's house, he went back to Kalapaki, and "drank more beers for a while." He remembered that at one point he had a headache, and asked Pierce for some aspirin. He explained that Pierce "gave [him] some, but they weren't aspirin, they were Valium." After taking the Valium, Defendant explained that he "passed out and [he did not] remember anything for however long that period was." His next memory "was [Pierce] waking [him] up and he had more beers" and Pierce wanted to go. Defendant related they went to Kealia Beach, then came back, and that is when they ran out of gas. He then called his friend Melanie "and asked her if she would come give him money" and she came to the gas station. Defendant said after he put the gas in the car he drove back to Kalapaki.

The next day, Defendant went to Melanie and Joe Palmer's house, where he told them that he "thought [he] had been in a fight, sticking up for a friend, and [he] didn't like

how [he] felt about that because [he] didn't remember being in the fight." Defendant also said "something to the effect that this is f* * *ed up." He recounted that he had never talked to Kerr, and did not have anything against him.

Defendant declared his story never changed when he spoke to the police. On the day in question, Defendant indicated he was "taking a nap and woke up and [Pierce] had taken [his] truck." As to the cut on his hand, Defendant said "it was from a piece of glass from sticking his hand into the sand, because that was part of his therapy" which his therapist had instructed him to do.

On cross examination the prosecution essentially questioned why Defendant had not mentioned to the police that he had taken Valium, that he had gone to Kealia Beach, or that Pierce had borrowed his car. Defendant said that he had made statements to the police on each of those matters, but that "there are things ... that [he] told [police] that are not in" the police report. He clarified that he did not loan his car to Pierce but, instead, Pierce "took it without [Defendant's] permission." In response to the prosecution's question, Defendant also admitted that he told the police that he did not think Pierce killed Kerr, but Defendant also noted that "he didn't think Pierce was the kind of person to blame him either." In response to questions as to what made him believe he was in a fight, Defendant replied, "Pierce made me think that."

Defense counsel called Sherman to testify to challenge the veracity of Pierce's testimony.[9] Sherman testified that prior to that day, he did not know Pierce. Sherman explained that while he was fishing, Pierce approached him and began talking and drinking several beers. Pierce continued drinking, and told Sherman a story describing what transpired when "he [had] wanted to get drugs from, I believe the guy's name was Kerr ... and [Defendant] was sleeping in the back of his vehicle at the time." Pierce further explained to Sherman that when "Kerr rejected [Pierce for] the drug sale, "he did what he had to do to get his drugs" and "that the guy was dead." Sherman recount-ed that Pierce then asked him for heroin, but that Sherman told him that he "did not do or use drugs." At this point, Pierce continued to talk, and eventually told Sherman "this story about how this thing took place."

On cross examination, Sherman admitted that he had been friends with Defendant for seventeen years. In addition, the prosecution suggested that Defendant and Sherman had exchanged two letters prior to Sherman's conversation with Pierce. Sherman denied this and stated that he and Defendant exchanged the letters after his conversation with Pierce.

After reviewing the record in its entirety, "we are not convinced that the error in this case was harmless beyond a reasonable doubt." *Gano*, 92 Hawai'i at 176, 988 P.2d at 1168. "Inadmissible evidence contributed to the credibility of [Pierce's] testimony and the inference of Defendant's" guilt. *Id.* The jurors were permitted to evaluate the credibility of Pierce's testimony in light of the fact that Defendant had not proclaimed his innocence to his cellmate. Similarly, the jurors were allowed to conclude that Defendant's account was false in light of his alleged hope of having the murder charge reduced to manslaughter.

As such, "[t]here is more than a reasonable possibility that this evidence may have weighed against Defendant's credibility and, therefore, contributed to his conviction." *Id.* at 177, 988 P.2d at 1169. The potential for harm was enhanced by the prosecutor's closing argument, which referred to the tainted testimony as evidence of Defendant's consciousness of guilt and hope of "getting away with manslaughter." Accordingly, it cannot be concluded that the admission of evidence was harmless beyond a reasonable doubt.

## VII.

Whereas the aforementioned evidence was erroneously admitted and it cannot be concluded beyond a reasonable doubt that the error was harmless, the court's September

---

**9.** *See supra* note 2.

19, 2002 judgment and conviction is vacated and the case remanded for a new trial.[10]

10. Because this case is remanded for a new trial, we need not decide the other points raised by Defendant on appeal. *See supra* note 2. Defendant's first claim involved whether the court erred by precluding testimony from Defendant's physical therapist due to defense counsel's alleged untimely disclosure of the witness. Presumably Defendant will have sufficient time to provide notice of this witness on remand. In addition, we need not address Defendant's two other issues on appeal, namely that the court erred by failing to give an instructions as to "involuntary" or "non-self induced intoxication," or an instruction on manslaughter. The necessity of such instructions will be based on the evidence as provided in the new trial; thus, such a determination is premature prior to the presentation of such evidence. Similarly, we need not reach Defendant's ineffective assistance of counsel claim, for any such error is dependent upon the strategy employed by counsel at the new trial.